13995

## JACKSON v. RECORD PUBLISHING CO.

(178 S. E., 833)

212

*Messrs. Robinson & Robinson,* for appellant,

*Messrs. Benet, Shand & McGowan* and *G. Duncan Bellinger,* for respondent,

February 7, 1935.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

The appellant was a candidate for nomination to the office of Senator from Lexington County in the Democratic Primary Election of 1932. For nomination to the same office, Dr. E. L. Dreher and C. E. Taylor were candidates. At a campaign meeting these candidates were present and each of them made an address. The respondent is an afternoon newspaper published daily in the City of Columbia, just across the river from Lexington County. It published the following account of that meeting:

"DRIVE OPENS IN LEXINGTON

· "Crowd hears aspirants make maiden talks Wednesday at Summerland.
"(*Special to The Record*)

"Lexington, July 20.—The County political campaign opened at Summerland today with about 1,700 people attending the first meeting. County Chairman Cyrus L. Shealy presided.

"Dr. E. L. Dreher, Leesville, candidate for the Senate, was the first speaker.

"He charged the present delegation with taking away the privilege of the people to elect their own commissioners and with hogging the Lexington Water Power Company.

"Saluda, he said, had received $75,000.00 for damaged roads, while Lexington received only 'two creosoted pine pole' bridges. 'Cip Jones,' he declared, 'said two years ago "we don't want money, we want roads and bridges." We didn't get the roads and bridges. Who got the money?' he asked.

"Tillman Jackson declared himself for an economy program.

"Rural school education was the keynote of the speech of George Kraft.

"Alfred G. Smith declared he would, if elected, see that factories were brought to Lexington.

"C. E. Taylor, the last senatorial candidate to speak, said his past record was an open book. He charged C. E. Jones and Tillman Jackson with stealing the school bill he had worked on for three weeks. Jones, he said, had helped to rob more women and children in and around Batesburg than anybody ever had and he had helped organize one of the most gigantic steals ever put over on the people.

"Candidates for the house of representatives and for county offices were to be heard later in the afternoon."

The appellant brought action against the paper for libel, alleging that the publication was willfully false and malicious; that this plaintiff never sold, traded, or bartered away the rights of Lexington County or of the public, in or to any of the roads and bridges of said county; and never in any way attempted to sell or barter away the rights of the county or of the public, in or to any of its roads and bridges. This plaintiff never stole any school bill of C. E. Taylor; that it was uttered with intent to injure and defame the plaintiff, to hold him up to public scorn and contempt, to convey to plaintiff's constituency and the public that he was dishonest in his public and private life, that he was a criminal and had violated the criminal laws of his State, that he was unworthy of public trust and confidence, and unfit to seek or receive the votes of his fellow citizens, and the publication conveyed to the readers of the article this false and libelous meaning.

The defendant, by answer, admitted the publication of the article; it alleged that the article is not open to the construction sought to be given it by the plaintiff in these particulars: It does not charge plaintiff with selling, trading, or barter-

ing away the rights of Lexington County in any roads or bridges of the county, or in attempting to do so; and, on information and belief, the language was not understood to make such charges as set forth in the complaint, by those having heard it; that the language in the speech of C. E. Taylor to the effect that plaintiff and C. E. Jones had stolen Taylor's school bill had reference to the fact that plaintiff (a member of the House), had introduced a bill in the Legislature along lines previously advocated by Taylor; and by him introduced in the Senate, and a copy of which was introduced by plaintiff and C. E. Jones in the House. Defendant further answered that plaintiff is a member of the House of Representatives of South Carolina, from Lexington County, and at the time of the publication of the alleged libelous matter was a candidate for the State Senate from that county; was a participant in the meeting at which the remarks set out in the published article were made; that said remarks were made by political opponents of plaintiff and was legitimate political criticism uttered by other candidates; that the article as published by defendant is substantially a correct account of a political meeting and the statements made by candidates thereat; that such article was published by defendant in its capacity of a daily newspaper, was made without malice, and was privileged.

The case came on to be tried by the late Judge W. H. Townsend and a jury. At the conclusion of the testimony for the plaintiff, the defendant's attorneys announced that the defendant would offer no evidence, and thereupon moved for the direction of a verdict for defendant. After argument, the motion was granted.

Plaintiff appeals upon two exceptions which make these questions:

1. That the language of the printed article of and concerning the plaintiff, with the attendant and surrounding circumstances, as shown by the evidence, was reasonably calculated to convey to the minds of the readers and of the

public a meaning defamatory of the plaintiff, and was reasonably calculated to injure the character of the plaintiff.

2. Under the evidence and the pleadings, the Court, under proper instruction, should have submitted the case to the jury.

There is little ground for contention over the principles of law which govern actions for libel and slander. The difficulty lies in the application of the law to the facts of each case.

It is true that he who publishes does so at his own peril.

It is true that one who offers himself as a candidate for public office becomes a legitimate object of legitimate criticism of his policies, acts, and of his fitness and qualifications for the office he seeks. Such right is not authority for false and malicious statements, libelous or slanderous in their nature.

A newspaper is privileged to publish accounts of a public meeting, provided such publication does not contain charges or statements, made by the paper, or a third person, which impute to another the commission of a crime or of acts which will bring him into contempt and ridicule of the public, and cause him to incur its hatred, or which will injure him in his business or calling, or which are false and malicious.

When the language alleged to be libelous, or slanderous, is plain and unambiguous, and admits of but one reasonable construction, it becomes a matter of law for the action and determination of the Court. If said language be ambiguous, or doubtful of meaning, it should be left to the jury to determine in what sense it was used, and what its meaning is.

We apprehend that there will be no controversy over these postulates of the law. With them in mind let us analyze the pleadings and scan the evidence to determine whether the Circuit Judge was correct when he directed a verdict for the defendant in this case.

The complaint plants its allegations of libelous utterances upon those portions of the published article which it is claimed charge that the plaintiff "sold, traded or bartered away the rights of Lexington County or the public in or to any of the roads or bridges of said County; or attempted to do so; That he and C. E. Jones stole a bill of C. E. Taylor."

In support of the proposition of the complaint that these charges apply to him and injure him, plaintiff relies upon these statements in the published article:

"Dr. E. L. Dreher was the first speaker. He charged the present delegation with taking away the privilege of the people to elect their own commissioners and with hogging the Lexington Water Power Company."

It will be observed that the complaint does not state this as one of the alleged libelous utterances.

Continuing: "Saluda, he said, had received $70,000.00 for damaged roads while Lexington received only 'two creosote pine pole bridges.' 'Cip Jones' he declared, said two years 'we don't want money, we want roads and bridges.' We didn't get the roads and bridges. Who got the money? he asked."

It will be observed that there is no reference in that paragraph to the plaintiff by name. But it is argued by plaintiff that inasmuch as he was a member of the legislative delegation it did refer to him, and was so understood. There is no reference in that especial paragraph to the "present delegation." Moreover, it is an established fact that the jurisdiction and supervision of the roads and bridges of the county was solely in the hands of the County Commissioners; placed there by Section 4582 et seq., Code 1932, which commissioners were appointed by the Governor by and with the consent of the Senate and a majority of the House Delegation. As a member of the delegation the plaintiff knew this, and the public is charged with a knowledge of a public law. It is patent that the language complained of did not refer to plaintiff.

Plaintiff depends upon the further statement from this published article to show that it is libelous in its application to him: "C. E. Taylor (was) the last senatorial candidate to speak * * *. He charged C. E. Jones and Tillman Jackson with stealing the school bill he had worked on for three weeks."

It will be argued that this statement charged plaintiff with larceny—an indictable offense. The only reasonable deduction from it is that Mr. Taylor prepared a school bill for introduction in the Senate which Jones and Jackson, without his consent, amended and introduced in the House. However lacking in courtesy to the Senator such conduct may have been, it certainly was not a criminal offense which would subject the perpetrators to indictment.

The other statements of Mr. Taylor, contained in the published article, refer to Mr. C. E. Jones alone and do not furnish grounds for implication that as a member of the legislative delegation the plaintiff was charged along with Jones.

Let us scan the evidence with a view to ascertain in what light the hearers and readers understood the language of Dr. Dreher and Senator Taylor.

The plaintiff himself admitted on cross examination that:

"Any matters dealing with the control and handling of roads and bridges in Lexington County, at that time, lay in the hands of the County Commissioners. *These roads and bridges matters was settled between the times I was nominated in the primary and before I was confirmed in the General Election. I didn't have anything to do with the settlement of the Power Company for the roads and bridges.* (Italics added.)

"Q. So that much of the article didn't refer to you at all? A. Under the statement, it referred to the delegation, of which I was a member."

It is patent that even if plaintiff were a member of the present delegation, the language of Dr. Dreher could not

have referred to him because, by his own showing, the delegation had nothing to do with roads and bridges and the settlement thereabout with the power company. When that settlement was made he was not a member of the delegation; he says so.

There were four witnesses for plaintiff. T. H. Rawl testified:

"Q. I am going to ask you, when you read that article, what impression it produced on you—what it conveyed to your mind in regard to Mr. Tillman Jackson? A. Well, I think it was a good deal against his candidacy. In the regard to the Lexington Water Power and roads and bridges settlement over there, it seems like somebody has hogged some money or something—I don't know—the way the charges were, I connected Mr. Jackson with it."

In view of the fact that the plaintiff was not a member of "the present delegation" when the settlement with the Water Power Company in regard to roads and bridges was made, and of the fact that by law the delegation had nothing to do with the matter of roads and bridges and the settlement, it required a very forced construction of the language of Dr. Dreher to make it applicable to plaintiff. The witness admits that he knew that the matter of handling roads and bridges and the settlement with the Lexington Water Power Company were solely in the hands of the county commissioners.

"The inference of hurt arising out of facts in order to become actionable must be such an inference as is established by the general consent of men, and the inference must be judged of by the Court in the first instance." 17 R. C. L., 264; *McGregor v. State Co.,* 114 S. C., 53, 103 S. E., 84.

The plaintiff must show by some evidence that "somebody had hogged some money or something," and there is no such evidence. This unexplained language is not actionable.

"The further allegation of the complaint is that the publication was 'libelous;' but so much is the statement of a legal conclusion, and not of a fact." *McGregor v. State Co.,*

114 S. C., 48, 53, 103 S. E., 84, 85, citing *Mayrant v. Richardson,* 1 Nott & McC., 347, 351, 9 Am. Dec., 707.

D. E. George testified:

"Was a member of the Legislature from Lexington County; had been since 1930. Is not now.

"Q. I will ask you what idea that article conveyed to you in regard to Tillman Jackson and the Lexington Water Power Company and the roads and bridges in Lexington County? A. It had reference to the fact that somebody had taken some funds—somebody in the delegation. Mr. Jackson was then a member of the delegation.   *   *   *"

### CROSS EXAMINATION

"I was a member of the delegation at that time. I didn't believe anybody had accused me of stealing anything. It said the present delegation. He didn't say anything about me in there.

"Q. Didn't say anything about Tillman Jackson? A. No, sir."

There is not a scintilla of evidence to show that the statement applied to Tillman Jackson any more than it did to D. E. George, and George says that it did not apply to him. Yet both of them were members of the delegation.

Haskell Shull testified:

"Q. Now, what impression did that convey to you in regard to the roads and bridges and the then present delegation? A. Well, the charge as made by one of the candidates charges the present delegation with hogging the rights of the Lexington Water Power Company people—that naturally reflected on the present delegation to my mind."

The published article does not state that one of the candidates charged the present delegation with "hogging the rights of the Lexington Water Power Company people." Clearly the witness did not understand, or else misconstrued the language used. The plaintiff does not complain that he was injured as a member of the delegation because the dele-

gation was accused of hogging the rights of the Lexington Water Power Company people.

Vernon Seay testified:

"Q. What impression did that article convey to you in regard to the roads and bridges and Tillman Jackson as a member of the delegation? A. It seems that someone was accused of some graft, in connection with the roads and bridges settlement with the Lexington Water Power Company.

"Q. Would that be commendatory or derogatory to a man running for office? A. I don't think it would do him any good."

It might not do the candidate any good and still not be ground for malicious libel. This witness, along with other witnesses, said he heard these same charges made on the stump.

The publication in our opinion is not libelous *per se;* is not malicious on its face. Is there proof of the express malice?

We think the publication falls within the class of *quasi*-privileged communications, inasmuch as it relates to the candidacy of one who is seeking public office.

" * * * when one becomes a candidate for public honors, he makes proffert of himself for public investigation. All his pretensions become proper subjects of enquiry and discussion. He makes himself a species of public property, into the qualities of which every one has a right to inquire, and of the finess of which, every one has a right to judge and give his opinions. The ordeal of public scrutiny, is many times, a disagreeable and painful operation. But it is the result of that freedom of speech, which is the necessary attribute of every free government." *Mayrant v. Richardson,* 1 Nott & McC., 347, 9 Am. Dec., 707.

"It is true, where the evidence is open to no other reasonable inference of fact than that the occasion, in the absence of actual malice, was privileged, the Court might properly so instruct the jury, leaving to the jury only the ques-

tion of whether the plaintiff had sustained the burden of showing the existence of actual malice. Or, as pointed out in the majority opinion in the *Switzer case,* where the evidence is susceptible of no other reasonable inference than that (1) the occasion was privileged, and (2) that the occasion was not employed in bad faith and with actual malice, for the purpose of making a defamatory communication, it would be the duty of the Court to hold that the defense of qualified privilege was established and to grant a nonsuit or to direct a verdict for the defendant." *Duncan v. Record Pub. Co.,* 145 S. C., 276, 143 S. E., 31, 56.

It cannot be soundly denied that in the present case the *occasion* was a *quasi*-privileged one. The publication complained of was the report of a public meeting at which plaintiff and others, as candidates for public office set forth their pleas for support and discussed the qualifications of their opponents. It is admitted that the report is substantially correct, and there is an absolute failure of proof of express malice.

"That publications respecting political affairs, public officers and candidates for office are in a measure privileged is recognized by the overwhelming weight of authority." 17 R. C. L., 353, § 101.

We are clearly of the opinion that the Circuit Judge was not in error in directing a verdict for the defendant.

The judgment is affirmed.

MESSRS. JUSTICES STABLER and CARTER and MESSRS. Circuit Judges J. HENRY JOHNSON and C. J. RAMAGE, ACTING ASSOCIATE JUSTICES, concur.